# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00829-CR

---

**Jeysen Cain, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 78306, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Jeysen Cain of aggravated robbery with a deadly weapon—a firearm. *See* Tex. Penal Code § 29.03(a)(2). The trial court assessed punishment at 28 years' imprisonment. In his sole appellate issue, Cain contends that the trial court abused its discretion by admitting extraneous-offense evidence of an earlier aggravated robbery that Cain committed. Finding no error in the admission of the evidence, we will affirm.

## BACKGROUND

*The Verizon Robbery*

During the evening of December 23, 2016, Isidro Yanez was working alone at a Verizon store in Killeen with no customers present. Two males entered, with their faces concealed. One wore a black hoodie and black athletic pants with white stripes down the side, and the other wore a dark or black hoodie, dark or black pants, and a red bandanna. Yanez could tell that they both were black teenage males around 5′6″ to 5′9″ tall.

They were armed, and they told Yanez in raised voices, "This is not a game." They demanded phones and ordered Yanez to take them to the store's safe. Yanez took them to the room at the back of the store with the safe. They told him to get down on his knees and turn around, and he complied.

Video recordings from store security cameras show one of the robbers aiming a gun at Yanez while he knelt with his back to the robbers. The recordings show the other robber taking unopened boxes of cellphones from the safe and putting some into a white bag and others into a black backpack. After the robbers left, Yanez locked the store's doors and called for help.

Robert Burton, the store's manager, was called to the scene and provided police with the security-camera recordings of the robbery. Burton could not identify the robbers from the recordings because they concealed their faces. He also checked inventory and prepared for police a list of what was stolen, including each stolen phone's serial number. The robbers had stolen about 40 phones, 34 of which were iPhone 7 models.

### The T-Mobile Robbery

Twenty days before the Verizon Robbery, a black male had robbed the employees of a T-Mobile store. As in the Verizon Robbery, T-Mobile employees were the only people in the store around sundown of that day. Employee Sean Lopez went outside the store's back door to smoke a cigarette and saw a black male emerge from near a dumpster, then walk toward the front of the store. Employee Phillip Jameson, still inside, saw a black male come in through the store's front door. Jameson thought him younger than 20 years old and about 5′10″ tall. He pointed a gun at Jameson, telling him that he wanted "all the phones that [they] had." Jameson

2

brought the robber to the back room and unlocked the safe. The robber told him to "get on the ground" and took several boxes of cellphones from the safe and put them in a black backpack.

The robber went outside through the back door. Lopez saw him and noticed that he was young, wearing a Nike gray pullover hoodie and dark-gray Adidas-type track pants, holding a gun in his right hand, and carrying "a backpack filled with phones." The robber looked at Lopez; said, "It's a wrap"; and ran off, dropping one of the new cellphone boxes out of the backpack. The robber got in a car near the dumpster, which then peeled out and drove off. Lopez picked up the dropped phone box and went inside to check on Jameson.

The two called police and their manager. Detective Joseph Delongchamps, of the Killeen Police Department (KPD), responded to the scene.[1] He talked with Jameson and Lopez and took the dropped cellphone box, still wrapped in plastic. He sent the box for fingerprint testing, which yielded a latent fingerprint, but he did not yet have a suspect for comparison.

The T-Mobile manager, Jared Ross, checked inventory to see what was stolen. The stolen phones were: eight iPhone 7 models, two iPhone 6S models, and three Samsung GS7 models. Ross gave police a list of the phones stolen, including their serial numbers.

Officers from the KPD's latent-fingerprint-identification unit searched a fingerprint database for any matches for the print recovered from the dropped cellphone box. There was a potential match with a known fingerprint taken from Cain. Joey Bernier, a fingerprint examiner, compared the recovered latent fingerprint to a known record of Cain's fingerprints. Bernier found twice as many favorable points of comparison between the recovered latent fingerprint and the matching fingerprint of Cain's than what is usually required to establish a match, and he opined that they were a match.

---

[1] Detective Delongchamps also investigated the Verizon Robbery.

3

*Investigating the Verizon Robbery Leads to Cain*

Following the robbery at the Verizon store, Ricky Miller, a Verizon employee, searched online for people selling cellphones and found a December 25, 2016 Craigslist ad from someone in the "Killeen / Temple / Ft Hood" area selling an iPhone 7 still wrapped in its box. The ad included photos of the box, and Miller could see in the photos, reflected on the box's packaging, "[t]he safe room, the reflection, the lighting point and our Killeen location," including a particular "column." He could tell that the photographer was standing in the Verizon store's back room in front of the safe.

Miller texted the seller at the phone number listed in the ad. He asked if the iPhone was still available, and the seller said that it was. Miller asked for the phone's serial number to see whether his provider would support that phone, and the seller sent a photo of the iPhone's box and serial number. Miller checked the number against the list of stolen Verizon phones, and it matched. He and the seller arranged to meet at a Walmart in Killeen. Miller reported the conversation to police and let them use his phone to keep texting the seller.

Detective Delongchamps reviewed the Craigslist ad and discovered that the seller's phone number belonged to Cain's mother and that Cain was a "registered user" of the number. He also learned from T-Mobile personnel that the number was once "attached" to one of the phones stolen in the T-Mobile Robbery.

Detective Delongchamps, impersonating Miller, texted with the seller. He and the seller agreed to meet in the Walmart parking lot. Officers prepared a "buy bust"—a controlled purchase of the stolen Verizon phone right after which officers would arrest the seller.

For the buy bust, Garrison Hennig, then a KPD officer, attended undercover as the buyer. Because weapons were involved in the robberies, SWAT officers waited nearby as

4

support. The seller arrived at the Walmart parking lot in a car with two women. He then met with Hennig, who asked the seller to show the phone, confirmed the price, and handed over the cash. They parted ways, and Hennig signaled to waiting officers to arrest the seller. Officers moved to apprehend the seller and told him to stop, but the seller responded, "I didn't do anything," and started running and throwing the cash in the air. After a short chase, officers arrested the seller, who was later identified as Cain.

Officers recovered the cellphone box that Cain brought to the buy bust. It bore a serial number matching one on the list of phones stolen in the Verizon Robbery, although it was different from the one that the seller had sent in the text conversation. Cain also had with him a T-Mobile iPhone 7, which Detective Delongchamps submitted for digital forensic extraction.

KPD Detective Keith Drozd performed the extraction. He found text messages and notes on Cain's phone. Some of the extracted text messages were the ones that either Miller or officers sent to the Craigslist seller to set up the buy bust. The "Notes" section of the phone included the text "All these niggas hatin on me cuz iam hittin licks," and Detective Drozd, based on his experience as a detective, understood "hittin licks" to be slang for committing robberies. In another text conversation, the person using Cain's phone was discussing phones with someone, and that person expressed a suspicion that Cain had stolen the phones. In another, the person using Cain's phone was discussing how to unlock a phone. And in another, the person using Cain's phone set up a meeting to deliver a phone to someone at a Waco flea market and discussed whether the phone was unlocked to work with any carrier.

Detective Drozd also extracted photos and videos from Cain's phone. A photo and a video both showed Cain wearing a black hoodie with a Nike label and black sweatpants with white stripes down the sides. Another video showed Cain handing an unopened iPhone box

5

to someone. Other photos and videos showed large amounts of money, including a photo of a black bag full of money, a video of Cain counting a large amount of money in $50 and $20 bills, and other photos of guns and money either shown together or separately.

Detective Delongchamps reviewed the digital extraction and discovered relevant location information, or the lack thereof, recorded by the phone. He explained that cellphones constantly record location data but that this could be disabled by either turning off the location feature or turning off the phone entirely. He discovered that Cain's phone recorded location information on the day after the T-Mobile Robbery while at or near the high school that Cain attended but recorded no location information on the day of the robbery. The phone also recorded location information throughout December, but, from 8:00 p.m. to 8:30 p.m. on December 23 while the Verizon Robbery was happening, the phone did not record location information. The last prior record of location information was from 7:45 p.m. that day, at or near Cain's house. The phone next recorded location information around 9:43 p.m., again at or near Cain's house. Except for this roughly two-hour dark period, the phone otherwise recorded location information that day.

Cain's mother and sister showed Detective Delongchamps photos posted to Cain's Instagram account. The photos showed Cain wearing "similar clothing to what he had" on during the Verizon Robbery, including a black hoodie with a white logo on the front and dark athletic pants with white stripes down the sides. On the Verizon security-camera recordings, the robber who took the phone boxes from the safe and put some of them in the black backpack was the one wearing clothing like Cain's.

KPD Detective Brian Goodsby also spoke with Cain's mother. She let him and other officers search her home, where Cain lived. Officers found seven boxes of new iPhones,

6

all still wrapped in their packaging, some in Cain's parents' bedroom and others in their closet, including an empty T-Mobile cellphone box. Detective Goodsby asked Cain's mother why she had stolen phones in her closet, and she responded that she took them from Cain because she was suspicious about why he had them. The officers also discovered another unopened cellphone box in Cain's mother's car. All the boxes bore serial numbers matching those of some of the phones stolen in the Verizon Robbery. They also found $1,940 in $20 bills in Cain's bedroom closet.

### *Cain's Trial and Conviction*

The State indicted Cain for the Verizon Robbery and tried the case to a jury. Cain objected to admitting evidence of the T-Mobile Robbery under both Rule of Evidence 404(b), to prove identity, and Rule of Evidence 403, because the danger of unfair prejudice substantially outweighed the evidence's probative value. The trial court overruled the objections.

Cain testified in the defense's case-in-chief. He admitted that police recovered cellphone boxes from his house but said that he got them from a friend at school named "Davion Turner," now dead, and only later learned that they were stolen. He admitted that he made the Craigslist ad, was the one texting with officers about the ad, and texted others to tell them that phones he was offering for sale were "going fast." He admitted that:

- one of his phone's videos showed him counting money;
- he posted the video to his Instagram account;
- about $1,940 was found in his room;
- he threw the cash at the buy bust, began running away, and said, "I didn't do anything wrong; I didn't do anything"; and

7

- a phone that he gave away to a friend at school was one of the phones stolen in the T-Mobile Robbery.

The jury convicted Cain of aggravated robbery with a deadly weapon, and this appeal followed.

## ADMISSION OF EVIDENCE

### *Standard of Review*

We review a trial court's admission of evidence for an abuse of discretion. *Sandoval v. State*, 409 S.W.3d 259, 281, 297 (Tex. App.—Austin 2013, no pet.). A trial court abuses its discretion only if its ruling "lies outside the zone of reasonable disagreement." *Id.* (quoting *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). Reversal for an abuse of discretion in admitting evidence requires more than simply disagreeing with the trial court's ruling. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).

If an admission of evidence was an abuse of discretion, we then analyze whether the admission caused harm by "affect[ing] the substantial rights of the" defendant. *Sandoval*, 409 S.W.3d at 287. We will not overturn a criminal conviction for non-constitutional error like wrongful admission of evidence if, after examining the record as a whole, we have fair assurance that the error either did not influence the jury or influenced the jury only slightly. *Id.*

### *Rule of Evidence 404(b)*

In a portion of his sole appellate issue, Cain contends that evidence of the T-Mobile Robbery was inadmissible under Rule of Evidence 404(b) because that robbery lacked sufficient common characteristics with the Verizon Robbery and so was not probative of Cain's identity as one of the robbers at the Verizon store.

The State may offer "[e]vidence of a crime, wrong, or other act" in limited circumstances. Tex. R. Evid. 404(b)(1); *Harmel v. State*, 597 S.W.3d 943, 960 (Tex. App.—Austin 2020, no pet.). The State should not offer it "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1); *Harmel*, 597 S.W.3d at 960. But it may offer it "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, *identity*, absence of mistake, or lack of accident." Tex. R. Evid. 404(b)(2) (emphasis added); *accord Harmel*, 597 S.W.3d at 960.

When, as here, the defense puts identity in issue, the State may prove identity by offering extraneous-offense evidence "of *modus operandi* in which the pattern and characteristics of the charged crime and the uncharged misconduct are so distinctively similar that they constitute a 'signature.'" *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008); *accord Johnson v. State*, 68 S.W.3d 644, 650–51 (Tex. Crim. App. 2002). "No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Segundo*, 270 S.W.3d at 88. A "signature" may even be just "one unique characteristic" shared by both crimes—for example, either the use of "the same antique silver crossbow" across several robberies or a rapist–murderer's having left his DNA inside both of two victims at or near the time of each victim's death. *Id.* at 88–90. But the shared characteristics must be "something that sets [the extraneous offense] apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime." *Id.* at 89 n.26 (quoting *Ford v. State*, 484 S.W.2d 727, 730 (Tex. Crim. App. 1972)).

9

The State argues that the T-Mobile Robbery shares sufficient common characteristics with the Verizon Robbery so that Cain's "signature" is on both. It points out that both robberies were committed by a black male dressed in a black or dark hoodie with a Nike logo and black or dark athletic pants. It notes that officers found evidence in Cain's phone of his wearing such an outfit. It also notes that both robberies involved a robber brandishing a gun, demanding only cellphones, making the store employee get on the ground when taken to the back of the store to get the phones, putting the phone boxes into a black backpack, and then leaving. Finally, the State notes that Cain's fingerprint was found on the cellphone box dropped in the T-Mobile Robbery and that he used a cellphone stolen in that robbery to advertise for sale a phone stolen in the Verizon Robbery.

Cain argues that the two robberies lack sufficient common characteristics. He says that witnesses disagreed about the backpack's color. And he says that "there is nothing that sets the extraneous T-Mobile [Robbery] apart from its class or type of crime in general, and marks it distinctively in the same manner as the" Verizon Robbery. Thus, he says that the "similarities of the extraneous offense and the charged offense . . . are not as unusual or idiosyncratic as to signal conclusively that the two offenses were the handiwork of the same individual."

We agree with the State. In both robberies, no customers were in the store. A robber then entered each store in the early evening through the store's front door, both times wearing a black or dark Nike hoodie and black or dark athletic pants. In both robberies, a robber had a gun. In both, a robber demanded phones and nothing else. When taken to the back interior of the store in both robberies, a robber told the store employee to get on the ground. Both times a robber took unopened boxes of cellphones out of the store's safe; put them into a bag, using a

10

black backpack across both robberies; and then left. Cain admitted having (and giving to a friend) a phone stolen in the T-Mobile Robbery. Similarly, officers found in Cain's home phones stolen in the Verizon Robbery. The phone of Cain's seized at his arrest was a T-Mobile phone, shared a number that was once "attached" to one of the phones stolen in the T-Mobile Robbery, was used to advertise the sale of a phone stolen in the Verizon Robbery, and contained a photo of Cain giving an unopened cellphone box to a friend. We see all this as a set of sufficient common characteristics between the T-Mobile Robbery and the Verizon Robbery so that both bore Cain's mark. *See* Tex. R. Evid. 404(b)(2); *Segundo*, 270 S.W.3d at 88; *Johnson*, 68 S.W.3d at 650–51. The trial court thus did not abuse its discretion by admitting, as proof of identity for the Verizon Robbery, evidence of the T-Mobile Robbery over the Rule 404(b) objection. *See Sandoval*, 409 S.W.3d at 281, 297. We overrule this portion of Cain's sole issue.

### *Rule of Evidence 403*

In the remaining portion of his appellate issue, Cain contends that the evidence of the T-Mobile Robbery was inadmissible under Rule 403 because the unfair prejudice stemming from admitting that evidence substantially outweighed its probative value.

A trial court may exclude evidence whose "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Unfair prejudice involves "an undue tendency to suggest an improper basis for reaching a decision," *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000), and often involves decisions based on emotion, *see Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *Gittens v. State*, 560 S.W.3d 725, 732 (Tex. App.—San Antonio 2018, pet. ref'd). "Rule

11

403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *accord Walter v. State*, 581 S.W.3d 957, 978 (Tex. App.—Eastland 2019, pet. ref'd).

Rule 403 calls for a balancing test, under which the analysis includes, but need not be limited to, (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for it. *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *Walter*, 581 S.W.3d at 978. Probative value is "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Davis*, 329 S.W.3d at 806.

Evidence admissible under Rule 404(b) that tends to prove the defendant's identity as perpetrator of the charged offense often is admissible under Rule 403 too. *See, e.g.*, *Johnson*, 68 S.W.3d at 651–52; *Lane v. State*, 933 S.W.2d 504, 517, 520 (Tex. Crim. App. 1996); *Burton v. State*, 230 S.W.3d 846, 850–52 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Karnes v. State*, 127 S.W.3d 184, 193–94 (Tex. App.—Fort Worth 2003, pet. ref'd).

We review Cain's contention under the standard Rule 403 factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for it. *See Colone*, 573 S.W.3d at 266; *Walter*, 581 S.W.3d at 978. The evidence of the T-Mobile Robbery was highly probative. It contained sufficient common characteristics with the Verizon Robbery to suggest that Cain committed both. And it included Cain's fingerprint on the dropped T-Mobile phone box and his having given a stolen T-Mobile phone to a friend. The first

12

factor therefore favors admissibility.  *See Johnson*, 68 S.W.3d at 651–52; *Chaparro v. State*, 505 S.W.3d 111, 117–18 (Tex. App.—Amarillo 2016, no pet.); *Burton*, 230 S.W.3d at 850–52.

As for the potential of the evidence to impress the jury in an irrational, indelible way, the evidence of the T-Mobile Robbery was no more inflammatory than, or fundamentally different in character from, the charged Verizon Robbery.  *See, e.g.*, *Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996) (observing that "the first murder, being no more heinous than the second, was not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose"); *see Regan v. State*, 7 S.W.3d 813, 818 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (concluding that evidence of extraneous robbery that made defendant's identity as perpetrator of charged robbery more probable because of shared *modus operandi* "did not have the potential to impress the jury in an irrational way").  This second factor favors admissibility.

Concerning the time needed to develop the evidence, the State called several witnesses, some of whom testified only about the charged Verizon Robbery, others who testified only about the extraneous T-Mobile Robbery, and some whose testimony applied to both. Considering all of the pages of the reporter's record that involved T-Mobile Robbery testimony only and the pages that involved that robbery from the witnesses whose testimony applied to both robberies, it took the State roughly one-fourth of its case to put on the evidence of the extraneous T-Mobile Robbery.  We do not view that as an "inordinate" amount of time for this case. *See Caston v. State*, 549 S.W.3d 601, 613 (Tex. App.—Houston [1st Dist.] 2017, no pet.). This factor therefore points in favor of admissibility.

As for the State's need for the evidence, we note that the State was required to prove Cain's identity as the robber as an element of the charged offense and thus that the State's

13

need for probative evidence of identity was great. Further, Cain affirmatively contested his identity as the robber, testifying that he was innocent and had the stolen phones only because a now-dead person had given them to him, thereby highlighting the State's need for evidence probative of the robber's identity. The evidence of the T-Mobile Robbery helped prove Cain's identity as the robber in the Verizon Robbery, rebutting his defense that he merely possessed the stolen cellphones. The State needed evidence of the T-Mobile Robbery as identity evidence in the face of Cain's defense, *see Karnes*, 127 S.W.3d at 193–94, so the fourth factor favors admissibility.

Given these factors, the trial court reasonably could have concluded that the danger of unfair prejudice from admitting evidence about the T-Mobile Robbery did not "substantially outweigh[],"Tex. R. Evid. 403, that evidence's probative value. *See Davis*, 329 S.W.3d at 806; *Walter*, 581 S.W.3d at 978. The trial court thus did not abuse its discretion by admitting evidence of the T-Mobile Robbery over the Rule 403 objection. *See Chaparro*, 505 S.W.3d at 117-118 (holding that trial court did not abuse its discretion by admitting evidence of extraneous robberies over Rule 403 objection in part because all the robberies shared the robber's distinctive clothing, his carrying a shotgun and a large knife, and proximity in time and place); *Burton*, 230 S.W.3d at 850–52 (holding that trial court did not abuse its discretion by admitting evidence of extraneous robberies over Rule 403 objection in part because all the robberies shared "that the banks all had no onsite security, the robbed tellers were young, and the robber wore a hat and sunglasses and made the robbery demand initially with a note"). We overrule Cain's appellate issue as it relates to his Rule 403 complaint.

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed:   May 5, 2021

Do Not Publish

15